**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

Kelly L. Stephens
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  December 20, 2024

Mr. Erik A. Grill
Ms. Heather S. Meingast
Office of the Attorney General
of Michigan
P.O. Box 30736
Lansing, MI 48909

Mr. Erick G. Kaardal
Ms. Elizabeth A. Nielsen
Mohrman, Kaardal & Erickson
150 S. Fifth Street
Suite 3100
Minneapolis, MN 55402

Re:  Case No. 24-1413, *Jonathan Lindsey, et al v. Gretchen Whitmer, et al*
Originating Case No. : 1:23-cv-01025

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc:  Ms. Ann E. Filkins

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 24a0273p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

SENATOR JONATHAN LINDSEY; SENATOR JAMES RUNESTAD; REPRESENTATIVE JAMES R. DeSANA; REPRESENTATIVE RACHELLE SMIT; REPRESENTATIVE STEVE CARRA; REPRESENTATIVE JOSEPH FOX; REPRESENTATIVE MATT MADDOCK; REPRESENTATIVE ANGELA RIGAS; REPRESENTATIVE JOSH SCHRIVER; REPRESENTATIVE NEIL FRISKE; REPRESENTATIVE BRAD PAQUETTE,

*Plaintiffs-Appellants*,

*v.*

GRETCHEN WHITMER, in her official capacity as Governor of Michigan; JOCELYN BENSON, in her official capacity as Michigan Secretary of State; JONATHAN BRATER, in his official capacity as Director of Elections,

*Defendants-Appellees*.

No. 24-1413

---

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:23-cv-01025—Jane M. Beckering, District Judge.

Argued: December 11, 2024

Decided and Filed: December 20, 2024

Before: SUTTON, Chief Judge; BUSH and MURPHY, Circuit Judges.

---

## COUNSEL

**ARGUED:** Erick G. Kaardal, MOHRMAN, KAARDAL & ERICKSON, P.A., Minneapolis, Minnesota, for Appellants. Heather S. Meingast, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellees. **ON BRIEF:** Erick G. Kaardal, Elizabeth A. Nielsen, MOHRMAN, KAARDAL & ERICKSON, P.A., Minneapolis, Minnesota, for

No. 24-1413                    *Lindsey et al. v. Whitmer et al.*                    Page 2

Appellants.  Heather S. Meingast, Erik A. Grill, OFFICE OF THE MICHIGAN ATTORNEY
GENERAL, Lansing, Michigan, for Appellees.

_____

**OPINION**

_____

SUTTON, Chief Judge.  In Michigan, as in seventeen other States, citizens may use
ballot initiatives to amend the State's Constitution.  Two Michigan state senators and nine state
representatives argue that, if citizens use the initiative to regulate federal elections, that process
violates the Elections Clause of the U.S. Constitution.  Because they lack standing to bring the
lawsuit, we affirm the district court's dismissal under Civil Rule 12(b)(1).

I.

The Michigan Constitution does something the U.S. Constitution does not.  It empowers
citizens to amend the state constitution directly without support from their elected representatives
in the state legislature or without the need for a convention.  *See* Mich. Const. art. XII, § 2.
Under the Michigan Constitution, this form of direct democracy takes two steps.  A Michigan
voter initially must file an initiative petition with the Secretary of State that contains the
supporting signatures of individuals totaling at least 10 percent of the votes cast for governor in
the last general election.  *Id.*  Then the proponent must obtain the support of "a majority of the
electors voting on the question."  *Id.*

Since the initiative became part of the State's Constitution in 1908, Michigan voters have
used it in many ways.  In 1978, they barred property and local tax increases above certain limits
"without direct voter approval."  *Id.* art. IX, § 25.  In 1992, they initiated and passed term limits
for Michigan's governor, lieutenant governor, secretary of state, and attorney general.  *Id.* art. V,
§ 30.  In 2006, they barred public universities from using affirmative action programs to grant
"preferential treatment" to any "individual or group" on the basis of "race, sex, color, ethnicity,
or national origin."  *Id.* art. I, § 26.

Michigan voters also have used the provision to regulate elections.  Two recent examples
bear on this case.  In 2018, they passed Proposal 3, which created automatic voter registration, a

secret ballot, an absentee ballot, straight-ticket voting, and an audit of statewide election results. They didn't stop there.   In 2022, voters passed Proposal 2, which created new voter-identification options, state-funded prepaid postage for absentee ballots, secure ballot drop boxes, and early voting.  The provisions in Proposals 2 and 3 apply to state and federal elections.

Eleven Michigan state senators and representatives took issue with this last feature of the election amendments—their application to federal elections.  They filed this action in federal court under 42 U.S.C. § 1983.  They claimed that the election amendments violated the U.S. Constitution's Elections Clause, which says that the "Times, Places and Manner of holding elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof."   As the claimants see it, the Clause allows only state legislatures, not the citizens themselves, to set the time, place, and manner of federal elections.  In bringing this lawsuit, the legislators sought to enjoin Michigan executive-branch officials from enforcing the two amendments.  The district court dismissed the complaint under Civil Rule 12(b)(1) on the ground that the state legislators lack standing to file it.

## II.

Article III of the United States Constitution confines the authority of the federal courts.  It permits us to decide only "Cases" or "Controversies."  U.S. Const. art. III, § 2.  A key ingredient of this requirement is standing—that a plaintiff must have a concrete, not an abstract, interest in the case before a federal court may wield the "judicial power of the United States."  *Id.* § 1.  The imperative springs from "a single basic idea—the idea of separation of powers."  *Allen v. Wright*, 468 U.S. 737, 752 (1984).  Call this formal division of authority what you will—an effort to cabin judicial power or an effort to constitutionalize judicial humility—its function is clear:  to "prevent the judicial process from being used to usurp the powers of the political branches" and to ensure that the federal courts do not casually referee inter-branch disputes that the Constitution assigns to the political process.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

This "irreducible constitutional minimum" comes with three requirements.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  The plaintiff must establish an "injury in fact,"

"trace[able]" to the defendant's actions, and "redress[able]" by a favorable decision. *Id.* (quotation omitted).

This case starts and finishes with injury in fact, standing's "[f]irst and foremost" prong. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998). An Article III injury consists of an "invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent." *Lujan*, 504 U.S. at 560 (quotation omitted). These conditions demand that an injury be real and affect the plaintiff in some "personal and individual way." *Id.* at 560 & n.1.

In the context of challenges to legislative power, the courts distinguish individual injuries of legislators from institutional injuries of a legislature. *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 802 (2015). The general rule is that individual legislators "lack standing to assert the interests of a legislature" merely because they have lost a vote or lack a majority. *Va. House of Delegates v. Bethune-Hill*, 587 U.S. 658, 667 (2019). A legislator lacks a personal right to prevent the "abstract dilution of institutional legislative power" that runs "with the Member's seat." *Raines v. Byrd*, 521 U.S. 811, 821, 826 (1997). But the entire legislature may sue when it suffers an "institutional" injury, namely when an entity or individual strips the legislature of authority as a body. *See Ariz. State Legislature*, 576 U.S. at 802, 821–22.

Two lines of Supreme Court decisions add context to these principles. *Raines v. Byrd* exemplifies the general rule: that legislators usually lack Article III authority to bring constitutional challenges to legislation. In that case, several federal senators and representatives challenged a law that gave the President a line-item veto of appropriations bills passed by Congress. *Raines*, 521 U.S. at 814. In doing so, they claimed that the law diminished their authority because it allowed the President to veto a single appropriation instead of requiring the President to vote up or down on all of the appropriations at once. *Id.* at 814–16. In a 7–2 vote, the Court concluded that the legislators lacked standing to bring the challenge. The majority opinion rebuffed the legislators' theory that a selective veto would make future appropriations votes less "effective," reasoning that the alleged injury was "wholly abstract" and "widely dispersed" among each lawmaker. *Id.* at 825, 829. That conclusion, the Court explained, fit with Congress's historical use of its impeachment authority, its authority to pass legislation, and its

authority to make appropriations as the constitutional means to combat irresponsible uses of Presidential power and was preferable to plunging the Supreme Court into "bitter political battle[s]" between the First and Second Branches. *Id.* at 826–28. Although the law gave members of Congress the right to sue in federal court to challenge the validity of the law, that did not matter. Congress, the Court reasoned, may not create Article III standing that does not otherwise exist. *See id.* at 815, 818. Justice Souter, joined by Justice Ginsburg, separately concurred in the judgment, reasoning that the legislators' alleged injuries were "insufficiently personal and concrete to satisfy Article III standing." *Id.* at 835.

Since *Raines*, the Court has remained skeptical of legislators' standing to challenge laws that purportedly diminish their official authority as legislators. Twenty-two years after *Raines*, the Court barred a single chamber of the Virginia legislature from challenging redistricting legislation in federal court. *See Bethune-Hill*, 587 U.S. at 667.

The Court has been equally skeptical of the efforts of executive branch officials to challenge laws on constitutional grounds. In one case, the Court barred a county auditor from challenging a state tax exemption in federal court because he "had no personal interest in the litigation" as the "public officer" enforcing it. *See Smith v. Indiana*, 191 U.S. 138, 148–49 (1903). In another, the Court barred Indiana executive-branch officials from challenging a state procedure in federal court that stopped them from certifying a proposed state constitution to county clerks because it "concern[ed] their official, and not their personal, rights." *See Marshall v. Dye*, 231 U.S. 250, 255, 258–59 (1913). In still another, the Court barred a county treasurer from challenging a state tax penalty program in federal court because he had "no personal interest in the litigation" as the county officer enforcing the program. *See Stewart v. Kansas City*, 239 U.S. 14, 16 (1915).

Through these cases and others, the federal courts have been vigilant in holding the Article III line against efforts by individual legislators or executive branch officials to bring constitutional challenges in federal courts. When it comes to individual legislators, there seem to be at least two special concerns. One is that the legislators already have "ample legislative power" to remedy injuries as representatives. *Cf. Campbell v. Clinton*, 203 F.3d 19, 23 (D.C. Cir. 2000). The other is that the federal courts remain wary of allowing political losers to

sidestep their colleagues and run "to a sympathetic court for a do-over." *Vonderhaar v. Village of Evendale*, 906 F.3d 397, 401 (6th Cir. 2018). The proper remedy lies "not with the courts but with the legislative process." *Crawford v. U.S. Dep't of Treasury*, 868 F.3d 438, 454 (6th Cir. 2017); *see also Baird v. Norton*, 266 F.3d 408, 411–12 (6th Cir. 2001); *Tenn. Gen. Assembly v. U.S. Dep't of State*, 931 F.3d 499, 514 (6th Cir. 2019).

The other line of Supreme Court cases creates a narrow exception to this general prohibition. The Court has permitted legislators to assert a claimed institutional injury on just two occasions.

In the first case, the entire legislature filed the lawsuit. In *Arizona State Legislature v. Arizona Independent Redistricting Commission*, Arizona voters amended their state constitution by ballot initiative to transfer redistricting power from the legislature to an independent commission. 576 U.S. at 792. The Arizona Legislature alleged that the Elections Clause "precludes resort to an independent commission" to draw electoral districts. *Id.* The Court held that the legislature suffered a concrete injury when the amendment seized "its alleged prerogative to initiate redistricting." *Id.* at 800. The commission "completely nullifie[d] any vote by the Legislature" to adopt its own redistricting plans. *Id.* at 804 (quotation omitted). As the Court has since explained, "the Arizona House and Senate," "*acting together*," can contest the usurpation of its power in federal court because there is "no mismatch between the body seeking to litigate and the" allegedly injured body. *Bethune-Hill*, 587 U.S. at 667.

In the second case, a controlling bloc of the legislature filed the lawsuit. In *Coleman v. Miller*, the Kansas Senate faced a 20–20 deadlock over whether to ratify the Child Labor Amendment to the U.S. Constitution. 307 U.S. 433, 436, 438 (1939). Save for the unicameral exception of Nebraska, a federal constitutional amendment must obtain majority support in both houses of each state legislature. U.S. Const. art. V; *see Hawke v. Smith*, 253 U.S. 221, 227–29 (1920). When the Kansas Lieutenant Governor broke the tie in the Kansas Senate by voting to ratify the amendment, the losing state senators turned to federal court. *Coleman*, 307 U.S. at 436. The Supreme Court permitted the lawsuit. It held that the dissenting senators suffered a concrete injury when the challenged tiebreaking procedure "overr[ode]" votes otherwise "sufficient to defeat ratification." *Id.* at 438. *Coleman* stands for the narrow proposition that

legislators suffer a concrete injury when they command enough votes "to defeat (or enact) a specific legislative [a]ct" and their votes would be "nullified" if the challenged conduct were allowed. *Raines*, 521 U.S. at 823.

In today's dispute, the Michigan legislators fall within the general rule, not within these narrow exceptions. They filed this lawsuit as individuals, not as approved representatives of their legislature. They do not allege that they passed election laws foreclosed by the 2018 or 2022 state constitutional amendments. And they do not allege that they command votes sufficient to pass contrary election laws in the future.

Proof that the claimants do not represent a majority bloc of the legislature is the reality that the legislature has enacted several laws that implement these constitutional amendments. In one, the legislature required the secretary of state to automatically register qualified electors who applied for driver's licenses, state identification cards, or changes of address. 2018 Mich. Pub. Acts 603; Mich. Comp. Laws § 168.493a(1). In another, the legislature required Michigan cities and townships to have "at least 1 absent voter ballot drop box" for each 15,000 registered electors. 2023 Mich. Pub. Acts 85; Mich. Comp. Laws § 168.761d(1).

In the last analysis, this case simply is not one in which the citizen petitions "completely nullify" the legislators' votes. *Ariz. State Legislature*, 576 U.S. at 788 (quotation omitted). Unable to fit this lawsuit into the narrow exception for such institutional injuries, the claimants cannot turn to the federal courts to transform their legislative defeat into a judicial victory.

In trying to fend off this conclusion, the legislators argue that this case is like *Coleman* because Michigan executive-branch officials nullified their votes by permitting citizen-led amendments to the Michigan Constitution that later infringed their legislative power. But this approach would inflate *Coleman*'s narrow exception into a gaping maw. If they were right, a Michigan legislator could challenge *any* state constitutional amendment created by an initiative because all such amendments would invariably limit some legislative power. That approach cannot be reconciled with the caselaw. Instead, we must follow *Raines*'s general directive: The Michigan legislators lack standing when they do not have the votes "sufficient to defeat" or enact a bill. 521 U.S. at 823.

The Michigan legislators analogize this case to *Coleman* in another way—that both lawsuits involve claims against state executives. But that is not the test. As *Coleman* held and as *Raines* explained, the lawmakers must show legislative power—that they represent the entire legislature (*Arizona*) or a controlling voting bloc of it (*Coleman*)—to establish an institutional injury to the legislature. *See id.* at 824. Without such power, it makes no difference that they train their complaint on state executive officers. *See id.* at 824 n.8. Article III demands a concrete injury regardless of whether the defendants convene in Washington, *id.*, or in a state capital, *Coleman*, 307 U.S. 433. That's why it makes no difference whether the legislators sue a state lieutenant governor, *id.* at 436, or sue the Secretary of the Treasury, *Raines*, 521 U.S. at 814, 824 n.8.

The legislators insist that the Elections Clause confers upon individual lawmakers a right to vote on federal election regulations and any deprivation of that right injures them. We decline this invitation to bore a good-for-Elections-Clause-only hole in *Coleman* and *Raines*. True, a concrete injury may "include harms specified by the Constitution itself." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). But if such a right existed, our caselaw places it with "Legislature[s]," not legislators. U.S. Const. art. I, § 4. That's why Arizona's legislature may mount an Elections Clause challenge to "a redistricting plan" that would "nullif[y]" future redistricting-related bills. *Ariz. State Legislature*, 576 U.S. at 804. And that's why the Court has indicated that individual legislators may not. *See id.* at 801–02.

The legislators point out that the Michigan Constitution vests legislative power over elections in individual lawmakers, suggesting that they must have suffered an injury as a result. But just as Congress cannot create standing in Article III courts that does not exist, neither may the Michigan Constitution. *See TransUnion*, 594 U.S. at 426; *Raines*, 521 U.S. at 818. The argument fails on its own terms anyway. The Michigan Constitution vests the legislative power in a "senate" and "house of representatives," not individuals. Mich. Const. art. IV, § 1. That separate lawmakers cast separate votes does not alter the reality that legislators do not vote "as a prerogative of personal power." *Raines*, 521 U.S. at 821.

The legislators claim that Elections Clause violations deprive them of a "right, privilege, or immunity" enforceable under § 1983. Right or wrong about this point, it would not tell us

No. 24-1413                  *Lindsey et al. v. Whitmer et al.*                  Page 9

whether the legislators have a cognizable injury that Article III empowers the federal courts to hear. *TransUnion*, 594 U.S. at 426.

The legislators persist that the Supremacy Clause constrains the Michigan Constitution to the extent it violates the Elections Clause. That is true in the abstract. But the Supremacy Clause doesn't establish standing. It is "not the source of any federal rights." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (quotation omitted). It declares only the rule of decision when state and federal law clash. *Id.*

The legislators invoke Michigan Supreme Court cases that recognize standing for state legislators bringing similar claims against state executives. The Court, for example, rejected *Lujan* in favor of a "limited, prudential [standing] doctrine" designed to "ensure sincere and vigorous advocacy." *Lansing Schs. Educ. Ass'n v. Lansing Bd. of Educ.*, 792 N.W.2d 686, 692 (Mich. 2010) (quotation omitted). But state standing law does not drive the meaning of Article III of the U.S. Constitution.

We appreciate the legislators' argument that, as an original matter, it's fair to question the line between *Raines* and *Coleman*. Some Justices have maintained that *Coleman* "stands out like a sore thumb from the rest of our jurisprudence, which denies standing for intragovernmental disputes." *Arizona*, 576 U.S. at 857 (Scalia, J., dissenting, joined by Thomas, J.). It is indeed odd that *Raines* denies standing for legislators whose votes are "less 'effective' than before," yet *Coleman* permits standing for legislators whose votes are "virtually held for naught." *Raines*, 521 U.S. at 825–26; *Coleman*, 307 U.S. at 438. But our station gives us no right to change Supreme Court precedents or redraw the lines created by them. What our station does permit us to do is to reconcile any tension in such precedents to make them as consistent as possible with the Constitution's text and the original understanding of it.

Our reading of *Coleman* comports with that understanding, informed by long-standing "historical practice" that "in analogous confrontations between" the legislature "and the Executive Branch, no suit was brought on the basis of claimed injury to official authority or power." *Raines*, 521 U.S. at 826. When Congress tried to impeach President Johnson for removing his Secretary of War in violation of the Tenure of Office Act, for example, he

No. 24-1413                    *Lindsey et al. v. Whitmer et al.*                    Page 10

defended himself in the Senate, not the Supreme Court.  *Id.* at 826–27.  Subsequent Presidents "urged Congress to repeal" the Act rather than urge the Court to declare it unconstitutional.  *Id.* at 827.  The Court only decided this important question of executive power more than half a century later, when a removed officer sued to recover his lost salary—a classic injury in fact.  *Id.* (citing *Myers v. United States*, 272 U.S. 52, 106–07, 173, 176 (1926)).  Had the federal courts intervened at the President's behest at the outset, they would have been "improperly and unnecessarily plunged into the bitter political battle" between the branches.  *Id.*  And it would have transgressed the traditional role of federal courts to refrain from "general supervision of the operations of government."  *Id.* at 829 (quotation omitted).  Just so here.

We affirm.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 24-1413

SENATOR   JONATHAN   LINDSEY;   SENATOR   JAMES
RUNESTAD;   REPRESENTATIVE   JAMES   R.   DESANA;
REPRESENTATIVE   RACHELLE   SMIT;   REPRESENTATIVE
STEVE   CARRA;   REPRESENTATIVE   JOSEPH   FOX;
REPRESENTATIVE   MATT   MADDOCK;   REPRESENTATIVE
ANGELA   RIGAS;   REPRESENTATIVE   JOSH   SCHRIVER;
REPRESENTATIVE   NEIL   FRISKE;   REPRESENTATIVE   BRAD
PAQUETTE,

> Plaintiffs - Appellants,

v.

GRETCHEN WHITMER, in her official capacity as Governor of
Michigan; JOCELYN BENSON, in her official capacity as Michigan
Secretary of State; JONATHAN BRATER, in his official capacity as
Director of Elections,

> Defendants - Appellees.

```
┌─────────────────────────┐
│         FILED           │
│     Dec 20, 2024        │
│  KELLY L. STEPHENS, Clerk│
└─────────────────────────┘
```

Before:  SUTTON, Chief Judge; BUSH and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's dismissal of the case is AFFIRMED.

ENTERED BY ORDER OF THE COURT

Kelly L. Stephens, Clerk